Good morning, Judge Bybee, Judge Morghia, Judge Singleton, and may it please the court. I'm James Hennifer. I represent the appellant and the plaintiff in the district court, Dr. Richard Fox This is a case, this case is unique factually because Dr. Fox was very very well qualified, taught at Harvard Medical School, double board certified in 90% of the doctors, even though there were three other people in his field, picked him to take care of these critically ill children. Yet, in 1999, he was summarily suspended, even though summary suspension is not allowed by the hospital bylaws, and that suspension continued through five cycles for another ten years, and during that time he received no procedural due process. He got a 10-minute hearing after he had been summarily suspended, which is kind of like a few words in your last cigarette. He'd already been convicted. He got the same thing before the Board of Trustees, but nothing through any of the rest of these cycles. What would a due process hearing have said? What would have happened at a due process hearing? Well, it's quite interesting because, of course, their position is, that is the Respondent's position, is nothing could have been said. There was a rule. Well, tell me what he would have said. The first thing that would have happened would, were there any real problems of fact-finding? Were there any problems? Why is that relevant when he's in clear violation of the hospital's rule? Well, because if there aren't any problems, they have no basis for applying that rule to them. Right. This is a challenge to the rule. It's like a facial challenge. He was given a hearing on that question before the hospital to see whether they would, whether there was any reason to change the rule. They decided not to change the rule. The California Court of Appeal has looked at this question, said it's a legislative rule. He's in absolutely clear violation, and he can't dispute that. What would be the use of a hearing? The hearing would determine whether or not, as applied to him, that rule fostered better health care quality. Well, that's not the way that we apply rules. But that's what the health care quality. If I had, if your client comes in with a speeding ticket, I don't get to ask whether it was okay on that particular day and on that particular place for him to be speeding. But he does get a hearing. If somebody says, okay, you're speeding. To prove the question of whether or not you were speeding. But Mr. Dr. Fox doesn't dispute he's in violation of the rule. Well, he does dispute that his, his. He disputes that he doesn't like the rule and he doesn't think it's a good rule as applied to him. But he does not dispute that he has failed to comply with the rule. Counsel, are you disputing that? He does. Counsel, are you disputing that? That he doesn't comply with the rule yet. Right. Yes, I am. Really? I think that his, his two alternates comply with that rule, just the same as. Did they have the same privileges that he had? They didn't have identical privileges. Okay. Then they don't, then he doesn't comply with the rule as the hospital determined. With the specific language of the rule. And the. Counsel, since you raised the issue of collateral estoppel, the California Intermediate Court of Appeals says in relation to this precise point, what kind of hearing would you hold? They said, Dr. Fox's issue is that the rule is a bad rule. He never denies that he violated the rule. Why isn't that decision of the court of appeals, essentially adopting the superior court's decision, why isn't that binding on you under collateral estoppel? Why isn't the only thing we can consider is Dr. Fox's contention that the rule is a lousy rule, and why under normal appellate practice mustn't we reject that contention? It's simply not appropriate in an appellate court. Well, the court of appeals in the State court simply held that we are highly circumscribed in what we can look at. We cannot look at anything other than whether facially this rule. Because they said that that was what Dr. Fox was contending. Well, that was all he could contend, they said, because of Majors, which was a case that was being used at that time, to say that these kinds of rule-making procedures were quasi-legislative. You could not look behind the rule. You could not look to its application. You were not entitled to any findings of fact or judicial determination of whether that rule actually did foster health care quality, or whether that rule was fairly applied to all doctors in the same circumstances, all of which could have come out and should have come out under the Health Care Quality Improvement Act, 11.112a.2, requires findings of fact like this before you can get the immunity. You can't simply say, look, we've passed a rule, and facially it looks like it fosters health care, and if you go up to the State court of appeals, all you can do is look at that rule, and if you don't abide by it, you get no hearing, no findings of fact, no procedural due process. You're deprived of your privileges without anything more. I simply don't think that rule ---- Well, except that, under the holding of the California courts, the only impediment to Dr. Fox's continuing to do what he'd done is that he find and present two physicians who can stand in for him when he's unavailable, and those two physicians, whoever they might be, in the entire universe of potential practitioners, has qualifications identical to his own. Which he had done for 10 years, including Dr. Marjorie McCracken, and which one of the competing physicians had as their alternative, Marjorie McCracken, who was then found in 2003 to be qualified three years later. Your contention is that under the standard of identical qualification adopted by the hospital, these two doctors in fact met that test. Yes, and they were found to have met that test three years later in 2003. That was ---- could have been found out in this hearing, and this could have been resolved, but it wasn't, because he didn't get any of these procedural safeguards before he was deprived of his privileges. For example, supposing the hospital said, look, we've built a new wing, we want every doctor to lease office space for us because they'll be close to the hospital. That's on its face going to help the quality of health care. And the doctor says, look, I have my own office, I'm not going to lease the space. Well, again, sorry, you lose your privileges because we've facially developed a rule that looks like it could help health care, and you're not abiding by that rule. You're out. No procedural due process, no fact finding, no nothing. That's the position they're taking. They're taking the position here that under the Health Care Quality Improvement Act, under Section 11112A.3, the language there that simply says, look, any such other procedures as are fair to the physician under the circumstances means that this Act sweeps aside all the procedural due processes in California for the bylaws of hospitals, for the procedures to privilege a doctor or to take his privileges away. Sweeps aside the antitrust laws. I mean, this is administrative chaos if that's the rule. They can make the rule. Nobody gets a hearing.  You lose your privileges. This is directly contrary to what this Court suggested was wrong with the Chudikoff case. The Chudikoff case, can you analyze that for me in terms of how is that analogous to the situation here? Well, Chudikoff was given none of the procedural safeguards of the Health Care Quality Improvement Act pre-deprivation, nor was Fox. Fox wasn't given anything. He was just said, okay, fine, here's the rule. There will be no hearing. You get no hearing. There was no even post-deprivation hearing to find these facts. And what's the strange thing about this is that even after he was deprived, over the privileges in 2002, 2004, 2006, and 2008, nothing. But during that period, they found, number one, that his two alternates complied with the rule, identical privileges. They were qualified, and nothing had changed. They found that other people who were practicing in the pediatric intensive care didn't have to comply with that rule. They would make exceptions. They would say an intensivist is good enough. In Chudikoff, what I think the problem with the court had with that, particularly Judge Hawkins, was, look, there was no opportunity for a hearing. He lost his privileges. They were suspended without any fair opportunity for a hearing, without meeting any of the requirements of the Health Care Quality Improvement Act. So how can you grant immunity? The same thing happened to Dr. Fox. How can you, without any compliance with any of the provisions, say that this is an adequate proceeding? May I reserve? Certainly. Thank you. Good morning. May it please the Court. Petr Bataldin on behalf of the defendants and appellees in this case. I'd like to begin with the question of procedures that were provided to Fox in this case. I don't want the Court to ignore the litany of pre-suspension process that was afforded to Fox. Beginning as early as 1993, discussions began in the Pediatrics Department about the value of the identical privileges rule and requiring backups to possess the same privileges that the designating physician possessed. Dr. Tan wrote an extensive letter to Fox explaining why the rule was a good one in the context of doctors who provide pediatric critical care and intensive care units. What follows over the course of the next four or five years into the late 90s is a robust debate in the Pediatrics Department about this particular rule. Fox. And it was a debate about the policy, wasn't it? I mean, basically it was a policy. This is the policy that the hospital wanted to institute regarding the backup positions. That's correct, Your Honor. And in the course of the course of the course of the course of the course of the And it was described as administrative from the very beginning, wasn't it? An administrative action. I mean, Fox, Dr. Fox didn't know that this was really a question of professional conduct, and it wasn't really framed as professional conduct until much later in the cycle of processes. Isn't that correct? I think it's correct that the issue wasn't framed as one of professional conduct, but the statute, HCQA, defines professional conduct to include behavior that could affect patient health and well-being. Certainly. But how is it fair to Dr. Fox to say at the beginning this is simply administrative I know it's policy. Don't worry about any of this other, you know, matters involving suspension and your possibly licensed possible report to BOMAX, because this is just this is just quasi-legislative. This doesn't have to deal with your professional misconduct. Isn't that basically how this began? And I'm just trying to figure out how is that fair to Dr. Fox to frame it in terms of administrative when really this, the implication of suspension of privileges is rather significant, and then when someone asserts HCQA, the protection of HCQA, there's a lot of stringent requirements, including reporting, that the hospital really didn't want to go to. Is that correct? There are a lot of questions there, Your Honor. Let me try to take those in turn. Okay. Fox was never told that he did not have to worry about complying with the identical privileges rule. Well, in 1999, the chief of staff wrote to Fox that this suspension is administrative in nature and not reportable to any regulatory or licensing agency. And I'm just curious, how is that? I mean, was there that seems to imply, or certainly Dr. Fox could infer, that by describing suspension as administrative and not reporting it to the board of medical examiners, weren't you, it seems like, wasn't the hospital, in effect, deeming this action to be one that did not involve professional misconduct or incompetence and therefore not a professional review action under HCQA? And I think the hospital concedes that this was not, did not deal with his competence. That's correct. We're not challenging Fox's competence. And in fact, that letter was mistaken. This was a reportable event, and the district court agreed with us. That's the basis on which the district court granted summary judgment. It was mistaken? Is that correct? It was wrong. That's right. This was a reportable event because it involved professional conduct. But my point was, he was never informed of that from the beginning. That's true. He was, he knew that it wasn't reported. And then, of course, that was to Fox's benefit. No physician wants to have his conduct reported to the National Practitioner Daily. But if I could make just a point.  Go ahead.  I have some follow-up questions, but go ahead. The reason that the failure to report to the National Practitioner Data Bank doesn't implicate any of the issues that are involving HCQA immunity here is because Congress created an intricate scheme delegating to the executive, to the Secretary, the decision about whether failure to report or reporting rises to the level that a hospital or health care entity should be deprived of HCQA immunity. That's not a decision that is for a court to make. In fact, the Fourth Circuit held it would be frivolous to contend that a hospital loses its immunity because it does not report a reportable event. So nothing hinged on the failure to report in the context of applying HCQA to this particular case. Well, but it seems like it mischaracterized the important nature of this, because  that required suspension of privileges and possible reporting. It seems like Mr. Fox should have maybe had a hearing, I mean, a full hearing that is required under HCQA that would allow you to have the waiver of HCQA. Your Honor, nothing in HCQA requires a hearing. 111.12a.3 is absolutely clear on that point. It provides for alternative procedures. You can either comply with the safe harbor procedures, which do include a hearing, or you can provide other procedures that are fair under the circumstances. But when you say, I mean, you may have more experience than I do, but in the limited experience that I've had in presiding over these cases, HCQA, the hearings that are given where someone has the full-blown present witnesses, squarely deals with professional misconduct, and they're often afforded those full-blown hearings. Yes, that's often the case. And in incompetent situations, that makes perfect sense. Well, but also in professional conduct situations. It's not just limited to incompetence. It's also if there's any kind of professional conduct review. Isn't that correct? There's no question a hearing could be provided. And does an article, I think it's 7.4-2 of the Medical Staff Bylaws, provide for a full-blown hearing allowing for legal representation, examination  involves professional conduct, professional competency, or character. Now, you contend that this matter involves Dr. Fox's professional conduct, yet he wasn't provided the process due under the bylaws. Is that correct? Yes. And nothing in HCQA makes the determination of whether immunity applies hinge on that provision of those procedures. Well, doesn't HCQA say if he wasn't allowed a fair process, you don't get to hide or I say hide, I don't mean that. In a derogatory manner, you don't get to use that as a shield from damages. What A3 provides, Your Honor, in HCQA is that a health care entity must provide procedures that are adequate and fair under the circumstances, and that the word circumstances is really, I think, the most important word in that statute for the following reason. There are going to be all sorts of different issues involving professional conduct and competence that can arise in a hospital setting. Some are going to require full-blown adjudicatory hearings where there's going to need to be presentation of evidence, cross-examination, and so forth. Not this case, though. This is a very simple case. We have a rule, Fox didn't follow it, and the bylaws say if you don't follow the rules, you don't retain your privileges. There was no need for a full-blown hearing. I mean, in allowing only these procedures, doesn't this indicate that the hospital considered Dr. Fox's actions to involve only a rule change rather than professional misconduct?  What the circumstances show is that the only issue on the table was Fox's failure to comply with a rule. Fox chose to make the issue not his compliance, because he couldn't challenge that, but the justification for having the rule in the first place. But I want to make clear that the Court may not ignore all of the pre-suspension process that was provided to Fox. There was an extensive debate. Three committees and the board of trustees examined this rule, the identical privileges rule. And I appreciate that, but I guess where I have a little bit of trouble here is how it was characterized from the beginning and whether ultimately that was fair to Dr. Fox, because it was argued on two separate occasions in State court that Dr. Fox's suspension did not involve misconduct. And later, years later, motion for summary judgment, then all of a sudden it's a professional dead-on, professional misconduct type of action. And I just question the fairness to Dr. Fox, because it was stated that Dr. Fox's challenge to the alternate coverage rule and the resulting curtailment of his privileges was unquestionably quasi-legislative in nature. That's what was used when, in response to whether this was a professional misconduct, you said the response by the hospital was no, it's quasi-legislative in nature. And now the whole reason you get to invoke HCQA is because it's professional misconduct and you're saying the procedures were fair. And how is it fair to switch out that argument at the very end when Dr. Fox was proceeding all along with, I know he got some hearings, but it wasn't a square-on professional misconduct characterized matter. It was a rule change, discussion over policy, and let's go forward. And so I just am questioning how that's fair. And I have two answers to your question, Your Honor. Throughout the 1990s, Fox could not have been under any illusion that he was free to avoid complying with the identical privileges rule as the Pediatrics Department was coming to formulate it and as it eventually became codified through committee and board of trustees approval in the late 1990s. He was told repeatedly in letters, you need to work on your compliance. It was sort of graduated discipline. You're not in compliance. You need to improve the quality of your backup. You need to make sure you have backups who have identical privileges. He exchanges detailed letters with officials about this point. And I think probably the most critical piece of evidence in the whole case is the letter from Beaupre to Fox in May 1998 that says you're not in compliance. Let's work together. Here are some alternatives we can explore. If you're going to insist on using the backups that you prefer, let's set up a training program or a preceptorship program so that they can obtain the training and the privileges that they need so then you can properly designate them. And Fox makes no response. He doesn't even – he doesn't offer to work together with the hospital at that point. He could not possibly have believed at that point that he was free to ignore this rule that was coming. And when it was finally imposed, he refused to abide by it. So there's no issue of notice, Your Honor. He was on notice. Perhaps, but he wasn't given the normal protections that are due and the normal process that is due to a doctor when the question is clearly professional misconduct. In fact, you know, in the actions, you know, of your client, it wasn't filed. The HCQA protection could have been filed at the motion-to-dismiss stage. Apparently, it wasn't. It wasn't until motion for summary judgment. So you all maybe didn't consider it, you know, professional misconduct. If you had, most hospitals, it appears, usually give the full due process that is afforded under 11-112 of the – of that provision. And I just – I'm just wondering, is that ultimately considered fair? Because right now you're arguing because if he wasn't given that due process that is typically afforded, you're asking the court to focus on this general provision that says, oh, overall, it was fair. And I'm just wondering, you know, why do you get to say at one point early on that it wasn't, that it was quasi-legislative when your response – that's your response to what this wasn't a professional misconduct, was it? And why shouldn't you be a stop from doing that at this point in time? Your Honor, if you were to hold that a hearing was required, you would be upsetting the congressional design that makes the safe harbor procedures optional. The safe harbor procedures requiring formal comment and hearing and so forth are lodged in 11-112B. Those are not mandatory. And so a whole – and that's what the Fourth Circuit recognized in Wahi. So you'd be creating a circuit split to boot. These procedures only need be fair under the circumstances, because Congress worded 11-112A3 in the disjunctive. And I want to focus on one other aspect, because in a number of your questions you've talked about professional misconduct. We don't have to prove there was professional misconduct. We don't even have to prove there was unprofessional conduct. All we have to show under the definition of a professional review action is that the action we took was related to conduct that could affect patient health and well-being. This rule obviously affects patient health and well-being, because it promotes the continuity of care with critically ill children, where there are often narrow windows of time for providing critical treatment. Unless there are further questions, I'll rest. Okay. Thank you. Roberts. Thank you, Mr. Hennifer. I believe you have time remaining. Actually, I think Judge Morgia has it precisely right. That is, for years, Dr. Fox had been led to believe that this requirement of identical privileges was not going to be applied to him. I'm sorry. When you say for years, you're talking about early 90s? Yes, in the early 90s. What happened in the early 90s? Why isn't he on notice once we get to 1998? Let's be precise on that. In 1992 and 1993, because Dr. Fox objected to the care of two patients and wrote up a report that a lady had languished for 30 hours in the emergency room and died as a result, the hospital came after him. And the net result of that was they said, well, we think we should have an identical privileges rule, and that the identical privileges rule should be suspended, and the net result of that was the medical executive committee said, no, we don't think this is correct. So from 1993 through 1999, he is under the impression that, well, some of the other people don't have identical privileges for their backups, including one of the hospital's own, Dr. Silva, who had Marjorie McCracken, Dr. McCracken, the same one Dr. Fox had. Counsel, I don't have any doubt that there's been a lot of bad blood between the hospital and Dr. Fox going back almost 20 years. This isn't bad blood. This is not bad blood. This is just simply what he was fairly told. But you're really not disputing, are you, that a rule was put into place at some point in the late 90s that changed the prior rule? Right. And that it was only applied to Dr. Fox and that there were no findings that that rule furthered quality health care. And that's exactly what is required by subsection 9 of 11-151. 11-151 says that professional, it must be professional misconduct that does or could affect patient care. Now, what does the could mean? What's the probability? And you're asking us to make the determination as to whether an identical privileges rule relates to care? You shouldn't have to. That should have been found by the hospital. That's what a findings of fact as required by HCQA do. They find whether or not, as applied to Dr. Fox, this rule does or does not affect quality patient care. That's a substantive requirement. It doesn't have a reasonable standard, 150.19. Sorry. Didn't the California Court of Appeals specifically address that issue and say that we find that the rule does have? Well, what they did not. They said, look, on its face, facially, without applying it in these circumstances, which is as far as we can go, and with the representation from the hospital and medical staff that this is quasi-legislative and does not involve misconduct or incompetence, we find that the rule on its face is okay. And then we start this litigation in 2004. It was more than okay. They said that it does have a nexus with patient care. On its face, it appears to have a nexus. Not that it does. There's no factual finding. Well, except that, the Court also found that the only issue that Fox had ever presented was objection to the rule on its face. That's all he could. It was structured that way so the hospital could not give him a hearing, so they could avoid the hearing requirements under California law. And if this Court says that it's okay for that one little tag phrase in 11-112-A3 to wipe out state law, we have a Tenth Amendment problem. If it can wipe out the antitrust laws, as John Bolton said when he testified about HCWA, this will wipe out the antitrust laws. The administration opposes this if it does. And Representative Waxman said, no, it doesn't. If you prove up an antitrust violation, it doesn't wipe out the antitrust violation. We proved an antitrust violation and survived summary judgment. We proved a retaliation claim and survived summary judgment. Does that little tag phrase wipe out retaliation statutes in every state? Because then any hospital can simply say, okay, this is good enough under the circumstances. And does it leave after that adjudicatory finding for the district courts and this Court to have to look into the facts? So your contention is that in order to prevail against Dr. Fox, the hospital must prove to the satisfaction of initially the district court, ultimately the court of or intermediately the court of appeals and perhaps the Supreme Court, that it's a good idea to have a rule requiring a physician to provide for backup in his absence or her absence with identical privileges under the hospital? Yes, simply because that's what's required for HCWA immunity. They have to make an effort to find facts. They made zero effort to find whether that was true and, in fact, found three years later that it wasn't true. So accepting it on the face of the statute leads to some huge problems. It leads to contradictions. The same contradiction, I'm sorry. So you're saying that at some point the question of the propriety of the identical privileges rule was litigated and found wanting? It hasn't been litigated. That's the problem. What is the predicate for your contention that it's not? In 2003, it was a finding that Dr. McCracken and Dr. Dahlstrom, who were his backups, without any change in circumstances, were adequate under the identical privileges rule. Now, that contradicts. Adequate for Dr. Fox? Yes, absolutely. You know, how can that be if the statute is so, the rule is absolutely self-explanatory? And the issue here is between the rule on its face and applying it to take away somebody's privileges and whether he's going to get due process. And the issue here is whether you get HCWA immunity without any findings whatsoever, without any due process, without any effort to tie it to health care quality. None of those are present here. And I would submit this case is unlike a Wahi or the Gordon case where there were extensive hearings or the Verde Valley case where, I mean, we're talking about days, 90 hours in Verde Valley. We're talking about nine days in. Your time has expired. You're well over your time, counsel. Okay, thank you very much. Thank you for answering our questions. We thank both counsel for the argument. And Fox versus Good Samaritan Hospital is submitted.
judges: Bybee, Murguia, Cjj Singleton (Alaska), Dj